James A. GELLER, Appellant,

v.

The NEW ENGLAND INDUSTRIES,
INC., and Standard Development
Co., Inc., Appellees.

No. 624, Docket 75–7568.

United States Court of Appeals,
Second Circuit.

Argued Feb. 20, 1976.

Decided June 1, 1976.

Richard F. Horowitz, New York City (Benjamin Geizhals, Weiss Rosenthal Heller & Schwartzman, New York City, of counsel), for appellant.

Stuart G. Schwartz, New York City (Burns & Jacoby, New York City, of counsel), for appellees.

Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

Appeal in this diversity case is from a judgment notwithstanding a verdict of $100,000 for the plaintiff-appellant in a suit for real estate brokerage commissions, quantum meruit and fraud. The judgment n. o. v. which also dismissed the complaint was entered by the United States District Court for the Southern District of New York, Robert L. Carter, *Judge.* We reverse and remand and in the interests of justice, 28 U.S.C. § 2106, order a new trial.

Appellant, who is a member of the New York Bar [1] but according to his testimony a licensed real estate broker and salesman neither in New York nor in Florida, claims to have arranged a contract relative to certain land in Pinellas County, Florida. Appellees, The New England Industries, Inc., a Delaware corporation ("New England Industries"), and its Delaware subsidiary and nominee, Standard Development Co., Inc. ("Standard"), were the buyers. A Florida-resident client of appellant's, one Crassas, was a defendant but along with his Florida Sunlife Investors, Inc. ("Investors"), and Sunlife Development Co., Inc. ("SunDev"), the sellers, also defendants, was defaulted and does not appeal.

Crassas' Investors was contract vendee of the Turf & Surf Country Club ("Turf & Surf") in Pinellas County; his SunDev was the optionee on three pieces of property contiguous to Turf & Surf in Tarpon Springs, Florida, from a Mr. and Mrs. Koch, the price for the options totaling $2,400,000. Appellant, Geller, testified that he was originally advised in December, 1970, by his client, Crassas, that the latter had a contract to buy the Turf & Surf property and the contiguous Tarpon Springs options and wanted appellant to help find a purchaser from him. After a trip to view the Florida property, Geller contacted a Mr. Clyne who was counsel to and an officer of New England Industries and ran its real estate operations. Geller met with Clyne in January, 1971, at New England Industries' office, representing himself as Crassas' broker, and Clyne affirmed New England Industries' interest and his authority to negotiate the purchase and asked for further documentation. After another visit to Florida to obtain documents from Crassas, Geller met again with Clyne who, because of Crassas' doubtful financial stability, allegedly orally agreed to pay appellant's 10 per cent commission "if we can tie up this property in a contract." Clyne reminded appellant, however, that New England Industries' interest would continue only if the Turf & Surf contract closed so that Crassas could sell it as part of the Tarpon Springs package. Appellant continued to act as an intermediary between Clyne and Crassas during January and February, delivering documents and information, and attending the Turf & Surf closing. On the day appellant arranged for the first meeting between Clyne and Crassas, however, Crassas fired Geller and tried to get him to sign a document acknowledging that he was not entitled to a fee for any closing with New England Industries. When Geller told Clyne that he

---

1. There is a good question whether he has sufficiently alleged or proved his citizenship in New Jersey where on argument he claimed it to be. *Cf. Basso v. Utah Power and Light Co.,* 495 F.2d 906 (10th Cir. 1974). On remand doubtless the district court will make certain any deficiency has been fulfilled.

had been fired, Clyne allegedly assured him that New England Industries would pay his commission, "no matter what happens," and appellant asked to be kept informed as direct negotiations between Clyne and Crassas proceeded. On May 5, 1971, Clyne asked Geller if he would accept a payment of $30,000 in cash and the rest of his commission in stock or convertible debentures of the nominee purchasing corporation, and Geller agreed. Although appellant and Clyne met often through the summer, the latter allegedly failed to disclose that a purchase contract had been executed on May 7, 1971. In fact, it was not until November, 1971, that Clyne told appellant that an agreement had been signed and that the deal was dead. Appellant asked to see the agreement, but Clyne at first produced only a May 5 draft. The draft provided that "no broker was instrumental" in bringing about the transaction but that Geller should receive a fee for services rendered, toward which the seller would contribute $15,000. On the basis of the purchase price in the draft, appellant sent New England Industries "or nominee" a bill for $206,400. When he finally received a copy of the May 7 executed agreement, he computed its purchase price to be $4,464,000 and sent New England Industries "or nominee" an amended bill on his legal stationery in the amount of $446,400 for "Professional Services Rendered re: Real Estate broker's commission." The draft's provision of a fee for Geller did not appear in the executed agreement. Clyne's testimony essentially corroborated the sequence of the foregoing events, except that he stated that he understood appellant to be Crassas' attorney, not his "broker," and that although he told appellant he was willing to help him collect

fees due him from Crassas, he did not obligate appellees to pay them. He also testified that there was no relationship between New England Industries and Standard and that he acted on behalf of Standard.[2]

The case was submitted to the jury on both a contractual theory that appellees had expressly agreed to pay Geller's commission themselves and a quantum meruit theory. Each theory required the jury to find that appellant was entitled to recover if he proved an agreement whereby he was to act as broker *and* the agreement was terminated by appellees in bad faith *or* appellant was the procuring cause of the contract to purchase. The jury was also instructed that if it found appellees liable it could award damages based on its determination of the commission agreed upon, or upon the reasonable value of appellant's services according to expert testimony and other factors such as the amount of work done and the benefits received by the appellees. The jury verdict for $100,000 was set aside on the basis that there was insufficient evidence to sustain it. While the court at first ordered a new trial, at appellant's behest it ordered a judgment n. o. v. completely dismissing the complaint so that appellant could press his appeal.

Appellant urges that there was sufficient evidence on trial for the jury to find liability either on the basis of termination in bad faith or on the basis that appellant was the procuring cause of the contract, and sufficient evidence to support the award of $100,000 on the basis that the expert testimony relating to the reasonable value of a broker's services in a $4,464,000 transaction ranged from an extrapolated $89,460, using appellees' expert's rate schedule, to appellant's expert's estimation of $223,200. If

2. Appellees moved at trial to dismiss New England Industries as a party on the ground that appellant failed to establish its connection through Clyne to the real estate transaction. Judge Carter took note of this motion in his opinion of July 29, 1975, 71 Civ. 5351, but in originally ordering a new trial he did not dismiss New England Industries as requested. On this appeal appellees seek to have Judge Carter's ultimate dismissal against New England Industries affirmed on the ground presented in their motion: that there was insufficient evidence that, as Judge Carter charged the jury it must find, New England or someone acting on its behalf made a contract with appellant. In light of the evidence, we decline to affirm the dismissal of New England Industries on this ground, and in our remand for a new trial we do not disturb Judge Carter's original ruling not dismissing New England Industries on this ground.

the case were as simple as appellant has evidently conceived it from time of trial to argument before us, we would be required to reverse and enter judgment on the verdict for appellant. It is· not, however.

Appellant has consistently conceived the case throughout his interrogation of witnesses, by virtue of his refusal to take a new trial and in his appellate briefs and .oral arguments as though the May 7 contract simply involved the sale and purchase of $4,464,000 worth of Florida real estate, including according to his computation $2.4 million due the Kochs if the three options held by SunDev were exercised, $1.5 million for New England's nominee, Standard, to purchase the assignment of those options, and $564,000 for the purchase of Turf & Surf. Unfortunately the contract did not consist of ·such a simple package.

The most straightforward aspect regarded the conveyance of Turf & Surf to which the parties explicitly attributed a purchase price of $564,000. Standard was to pay SunDev $20,000 down, $180,000 cash at closing, $200,000 at closing in the form of a note payable before December 31, 1971 (secured by a third mortgage providing for releases to permit construction of an apartment complex on Turf & Surf property zoned therefor), and a note for $144,000 payable March 31, 1972, and secured by a second mortgage. The purchase price of the assignment by SunDev of three options owned by the Kochs on land contiguous to Turf & Surf was not, however, an automatic additional $3.9 million. For the property under option, together with some Turf & Surf property, the parties contemplated Standard's seeking from the City of Tarpon Springs a zoning change to permit the building of 5,000 residential units. The contract provided for delivery by Standard to SunDev "at time of exercise of the aforesaid options" of *up to* $1,000,000 of convertible five-year 6 per cent debentures, and *up to* $500,000 non-interest-bearing debentures.[3] The former debentures were payable in aggregates of 10 per cent per year only if two years after approval of residential zoning Standard had not exercised any portion of its options. The non-interest-bearing debentures were subject to reduction by $400 for each residential unit less than the 5,000 authorized by the City if Standard were unable to obtain the zoning change for 5,000 units.[4] The contract ·in short was, as· we view it, a rather complex "package deal" contemplating the possible exercise of options practicably conditional upon certain ·zoning changes being effectuated and the consideration therefor dependent upon a formula based in part on payments required to be made to the seller's optionors and in part on the number of residential units the construction of which would be made legally permissible.

Appellees' Clyne testified that the agreement of May 7 was incomplete because the parties had not come to terms on the actual consideration or property to be transferred; while it may be true that exhibits referred to in the contract as delineating the lots to be transferred were not attached to the agreement of May 7 introduced at trial, the document itself was plainly an agreement of sale, containing, it appears to us, all essential terms and conditions and signed by sellers and buyer. The contract, however, did not close as provided on May 21,

---

3. The contract provided that all debentures were to be

issued in amounts directly proportional to the ratio which the option price payable to CARL KOCH and PAULA KOCH bears to the total sum of $2,400,000.00 (the total sum which may become payable to CARL KOCH and PAULA KOCH under the option agreement) as the same.relates to the maximum of $1,500,000.00 (the maximum amount of debentures which may be issued to SUNDEV if one hundred percent of the option is exercised). All debentures issued under the terms of this agreement shall be "subordinated debentures"; to be issued as the options are exercised.

4. The contract contained other requirements, such as one that SunDev use its best efforts to obtain commercial zoning for at least 15 acres under one option. It further provided that upon the exercise of options SunDev would receive subordinated mortgages, which, somewhat ambiguously, Standard was "entitled to release portions of . . . from the encumbrance thereof in an orderly manner by [certain payments] . . .·."

1971. On May 24, 1971, Standard paid $100,000 (in addition to the $20,000 down) to aid the financially pressured Crassas in making an option payment in July; as security for this payment Standard took a deed to the Turf & Surf property and gave promissory notes and a third mortgage on the property to Investors. In November, 1971, Standard reconveyed all but six acres (13 lots) of the Turf & Surf property to Investors, apparently because the land could not be used as intended since zoning exceptions could not be procured there or on the Koch property. Thus, the ultimate transaction consummated amounted to six acres transferred for $120,000. Appellee claims, of course, that the most which appellant could claim is $12,000 (10 per cent of $120,000), but that, having refused to accept a new trial, appellant is now bound to receive nothing if the judgment n. o. v. is not affirmed. Appellees further misapprehend that the judgment n. o. v. indicates that they were entitled to a directed verdict as a matter of law.

The first question we have is whether New York or Florida law governs. Appellees argued at trial that Florida law should apply because the land involved in the contract was situated in Florida; the contract also provided that the law of Florida would govern its construction and any disputes arising under it. Appellant argued at trial, and evidently persuaded Judge Carter, that the alleged oral promise constituting the brokerage contract, made in New York where Clyne and Geller talked and involving appellant's services in New York, was not a contract which produced any interest in the Florida real estate but rather a personal liability on a separate New York brokerage contract. Appellees do not contest this point on appeal and we take it for granted that New York law, which we understand Judge Carter purported to charge, governs. Appellees' pleadings did suggest a defense of illegality based upon appellant's not being a licensed real estate agent or broker in either Florida or New York.

Since they have not pressed this point on appeal we do not feel bound to take such a defense into account,[5] as we do the question of lack of jurisdiction, note 1 *supra.*

The law of New York relative to real estate commissions, only partially referred to by the parties here, is well established and, all things considered, quite clear. We start with the premise that in New York, as elsewhere,

> in the absence of an agreement to the contrary, a real estate broker will be deemed to have earned his commission when he produces a buyer who is ready, willing and able to purchase at the terms set by the seller . . . .

*Lane—The Real Estate Department Store, Inc. v. Lawlet Corp.,* 28 N.Y.2d 36, 42, 319 N.Y.S.2d 836, 840, 268 N.E.2d 635, 639 (1971). It matters not that the contract is unenforceable (by virtue of a defect of title) or not completed (by virtue of one party's nonperformance). A broker's right to compensation is not dependent upon performance of the realty contract or receipt of the selling price by the seller unless such a condition is made part of the brokerage agreement. *Hecht v. Meller,* 23 N.Y.2d 301, 305, 296 N.Y.S.2d 561, 563, 244 N.E.2d 77, 79 (1968). It is for this reason that appellees err in urging that regardless of the terms of the brokerage agreement appellant could be entitled at most to 10 per cent of the value of the $120,000 property ultimately conveyed. A broker completes his end of the bargain when he brings a buyer, or as may be in this case a seller, ready, willing and able to purchase at the terms put by the other. *Lane, supra,* 28 N.Y.2d at 43, 319 N.Y.S.2d at 841, 268 N.E.2d at 639.

It is also true, however, that where the buyer and the seller come to an agreement which is conditioned upon the happening of a contingency having no connection with the fault of either, and the contingency (*e. g.,* the grant of a zoning law change or variance) does not come to pass, the broker is not entitled to a commission. *Hubbard v. Tobin,* 15 Misc.2d 65, 67–68, 179

5. *See* N.Y. Real Property Law §§ 442–d, 442–f (McKinney 1968) (Section 442–f exempts attorneys from requirement of real estate broker's license under Section 442–d).

**1386**

N.Y.S.2d 611, 614 (Sup.Ct.1958). Of course, an exception to this rule exists where the person employing the broker has in the agreement assumed the risk that the contingency might not occur or, better, undertaken that it will; in such a case the broker will prevail. *O'Hara v. Bronx Consumers' Ice Co.,* 254 N.Y. 210, 215–16, 172 N.E. 472, 474 (1930); *Hubbard v. Tobin, supra,* 15 Misc.2d at 68, 179 N.Y.S.2d at 614–15.

■ Applying these principles of New York real estate law to the case at bar, it is clear that we must reverse the judgment of the district court at least insofar as it denies the appellant recovery, whether on his express contract claim or his quantum meruit claim, relative to the Turf & Surf land agreed to be conveyed in the May 7 contract (as opposed to what was ultimately transferred in November, 1971). As the jury evidently viewed the brokerage agreement, whether under appellant's express contract or quantum meruit theory, Clyne's promises to appellant themselves did not condition payment of commission upon any event other than the "tying up" of the property "in a contract," which did occur on May 7, 1971. Even appellant's firing by Crassas, the jury evidently believed, did not alter the otherwise unconditional nature of the promises. Appellant's efforts extended over two months before his firing to bring ready, willing and so far as appears able parties together to buy and sell the Turf & Surf property. A commission either on a 10 per cent or lesser basis, depending upon the jury's finding at the new trial, would be earned upon the $564,000 agreed-upon purchase price of Turf & Surf if appellant establishes, as we see no reason he should not, that he was the procuring cause of the May 7 agreement.

■ At the same time, under *Hubbard v. Tobin, supra,* appellant is not entitled to any commission whatsoever on the optioned land if the trier of fact finds that the exercise of the options and payment therefor were conditioned as they appear to have been on the optioned property's rezoning as residential, a condition which was evidently not fulfilled. It is also possible, but on the evidence rather unlikely, that a jury may find, under a proper charge, taking the option aspect of the case further into account, that appellees had expressly agreed that appellant earned a commission on the optioned property irrespective of the zoning question, or that the condition of procuring zoning was not fulfilled by virtue of the fault of the buyer. In either case appellant would then be on firm ground for this portion of his commission. According to the May 7 contract, however, it is rather plain that if the land could not be rezoned, appellees would not exercise their option to buy, and would not be obliged to deliver payment therefor, the total price of which would come to $2.4 million to the Kochs and $1.5 million of debentures to the sellers. The sale of an unexercised option necessarily cannot by implication of law carry with it, absent express contrary agreement, a commission on any price other than the price paid for the option, unless and except as the option is exercised, for there is no purchase and sale of the property but only of the underlying option involved. At least, where the option is subject to an implicit if not an express contingency or condition, which remains unfulfilled for reasons beyond the control of the party sought to be charged with the commission, the parties have agreed to nothing (except as to the price of the assignment of the option) by agreeing to its assignment. *See Hubbard v. Tobin, supra.* A prescient broker may obtain if he can, in an option transaction, an express agreement that a commission will be earned irrespective of zoning changes; if the law were otherwise, we would expect, there would be a multitude of downcast real estate brokers walking the streets of New York who had failed to collect their commissions on property optioned on condition of a non-materializing zoning change.

On remand for a new trial in accordance with this opinion we suspect that the district court will be able to guide the parties more accurately to a resolution of their difficulties and, if not, the jury to a more accurate estimate thereof.

Judgment reversed and remanded.

**VAN GRAAFEILAND, Circuit Judge (concurring):**

I agree that the judgment appealed from cannot stand and that there must be a new trial. However, because it is not at all clear to me how the jury arrived at the unimaginative figure of $100,000, and because the facts below were not developed with crystalline clarity, I am more hesitant than my brothers to set guidelines for the retrial.

I would only suggest that, on retrial, counsel exercise greater diligence in establishing the proof necessary for a recovery in quantum meruit. Where, as here, plaintiff claims to have represented both buyer and seller, his recovery, if any, against the buyer should be limited to the value of the services he performed for the buyer. Such value is not established simply by showing the customary real estate commission for a broker representing a single client. *Zuckerman v. Martin*, 29 Misc.2d 634, 641, 210 N.Y.S.2d 124 (New York City Ct.1960); *Eadie v. Arc Wood Development, Inc.*, 19 Misc.2d 98, 101, 189 N.Y.S.2d 340 (Westchester County Ct.1959).