Mohamed HABIB and Middle East
Services, Appellants,

v.

RAYTHEON COMPANY and Raytheon
Services Company, Appellees.

No. 79–1147.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1979.

Decided Jan. 21, 1980.

Rehearing Denied Feb. 25, 1980.

Judah Best, Washington, D.C., with whom Roslyn A. Mazer, Washington, D.C., was on the brief, for appellees.

Jack A. Blum, Washington, D.C., with whom Ronald L. Plesser, Washington, D.C., was on the brief, for appellants.

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.

Opinion for the court filed by Senior Circuit Judge LUMBARD.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

LUMBARD, Senior Circuit Judge:

Appellants Mohamed Habib and Middle East Services ("MES") (hereafter collectively "Habib") appeal from an order entered December 1, 1978 by Judge Oliver Gasch of the District Court for the District of Columbia granting summary judgment on statute of limitations grounds to defendant Raytheon Company and Raytheon Services Company ("Rayserve") on Habib's claims for breach of contract, tortious interference with contractual relationships, and conspiracy to defraud. We affirm Judge Gasch's decision in part, but reverse and remand other parts of this case on the grounds that the applicable statute of limitations does not bar Habib's action because of the severable nature of the agreement in question, and that, as to his claims respecting the severable portion, Habib has raised genuine issues of material fact.

Habib is an American citizen who resides in the District of Columbia and MES is a division of Mundus Corporation, a District of Columbia corporation with its principal place of business in the District of Columbia, and wholly owned by Habib. Raytheon, along with its wholly owned subsidiary Rayserve, is a Delaware corporation with its principal place of business in Massachusetts. Raytheon and Rayserve are engaged in the manufacture and sale of technologically advanced weapons, including the Hawk Missile System, which Raytheon hoped to sell to the government of Saudi Arabia.

In 1971, the Saudi royal family, according to Habib's allegations in the record, decided to channel the country's arms purchases through one of its members, Prince Abdallah (who did business under the name "Arabian Establishment for Trade, Shipping and Air Navigation"). Abdallah then contacted Habib, whom he told to inform Raytheon that henceforth Raytheon should deal with Habib as agent for Abdallah on sales such as the Hawk Missile System. On March 4, 1971, Abdallah (through Arabian Establishment) entered into a contract with Habib and MES providing for Habib and MES to receive up to 20% of any commissions earned by Abdallah under Saudi Arabian sales contracts.

On May 14, 1971, Rayserve signed a contract with Abdallah, described as a Representative Agent Agreement (the "Abdallah contract"). Under this contract, Abdallah became Rayserve's sales agent in Saudi Arabia for certain Raytheon products including the Hawk Missile System. Abdallah was entitled to receive 6% of the gross selling price of these items as commissions from Rayserve. This contract contained a clause recognizing the "existence and participation" of MES, and recited that an agreement between MES and Rayserve "is attached and hereby made a part of this Agreement." Paragraph 20 of the Abdallah contract stated that Rayserve would pay to MES 20% of the money due Abdallah under the contract.

The Abdallah contract was executed in Saudi Arabia but contained a choice of law clause providing that "any claim or controversy relating to this Agreement, its interpretation, performance, and validity shall be construed and adjusted in accordance" with the laws of Massachusetts. By its terms the Abdallah contract was to last through June 30, 1976, but after June 30, 1973 it was terminable on four months notice.

On May 17, 1971, three days after the Abdallah contract was signed, Rayserve, MES and Habib entered into a contract (the "Habib contract") under which Habib agreed to "identify" and "qualify" a "Saudi Sponsor/Agent", to provide "miscellaneous inputs and support" for Raytheon's Saudi Arabian activities, and to give Raytheon "advice and direction." Habib was to receive $25,000 a year in monthly installments for the duration of the Abdallah contract, and 20% of any payments earned by Abdallah, whenever any such payments were made to Abdallah under his agreement with Rayserve. Under the Abdallah contract Rayserve was not obligated to pay any commissions to Abdallah until Raytheon delivered and received payment for the goods sold. Under the Habib contract, Habib was not entitled to receive his share of Abdallah's commissions until Abdallah was paid.

Rayserve made monthly payments towards the $25,000 per year consultancy fee due under the Habib contract from May of 1971 until December, 1971, by which time Habib had received $16,666.04. On October 28, 1971, Abdallah had written to Rayserve, in Arabic, a letter which contained the phrase (in the unofficial translation used by the district court), "I am forced to refuse representing you." In a letter dated February 18, 1972, Rayserve told Robert Clark, who headed a company affiliated, at the time, with Middle East Services, that it would have to accept Abdallah's decision and that "[t]his, of course, affects the agreement with Mohamed [Habib] and Middle East Services since it was completely contingent upon the Prince's agreement."

At about this time the chief executive officers of Raytheon visited Saudi Arabia and met with Abdallah. On February 23, 1972, a Rayserve Vice-President, C. O. Iselin, wrote to Abdallah on his return to the United States confirming the "concellation" [sic] of Rayserve's agreements with the Prince, and saying that "[w]e shall continue to call on Your Highness through our common friend and in the manner in which you have directed us."

Habib, through his attorney, thereafter made several attempts to secure payments he believed were due him under the Habib contract.[1]

In April, 1973, the Saudi government agreed to purchase a Hawk Missile System from Raytheon.

In late 1977, the Securities and Exchange Commission began an investigation into the legality of payments made abroad by Raytheon.[2]

On February 18, 1978, plaintiffs filed this lawsuit in the District of Columbia, invoking federal jurisdiction on grounds of diversity.

Judge Gasch granted summary judgment to defendants on the basis of the three year statute of limitations applicable to contract suits in the District of Columbia under D.C. Code 12–301. He viewed Rayserve's action in ceasing to make monthly payments in January, 1972, as accruing in Habib's favor a right to sue for breach of contract. Judge Gasch reasoned that District of Columbia law controlled the limitations question because first, under *Klaxon v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court sitting in diversity must apply the conflicts rule of the forum and in the District of Columbia it is well-established that "the statute of limitations of the forum must be automatically applied . . .". *Manatee Cablevision Corp. v. Pierson*, 433 F.Supp. 571 (D.C.D.C. 1977). Second, he rejected Habib's argument that the Massachusetts choice of law clause in the Abdallah contract should be imported into the Habib contract, which contains no such clause. The Massachusetts statute prescribes a six year limitations period in contract actions. As reasons against reading the two contracts together Judge Gasch relied on the fact that Habib was not a party to the Abdallah contract and that there was no danger, in the case of the Habib contract, that the contract would be governed by the unfamiliar law of Saudi Arabia[3] since the Habib contract, unlike the Abdallah contract, was executed in the United States by American citizens. Judge Gasch ruled that the only parts of the two contracts that had to be read together were the provisions relating to the sharing of commissions between Habib and Abdallah. Third, Judge Gasch held that even if Massa-

1. Appellees argue that some of these letters contain the essence of the claims made in the instant suit, which was instituted in February, 1978. They contend this fact belies Habib's contention that Rayserve kept its payments to Abdallah secret and thus prevented Habib from knowing when his right to bring suit had accrued. Because of the conclusion we have reached, it is unnecessary for us to reach this point.

2. The record does not contain any information as to whether the SEC investigation was ever completed, and, if so, what the Commission's findings were.

3. Moreover, one of the parties to the Abdallah contract was a member of the Saudi royal family. It is well known that in Saudi Arabia the monarch and his council of princes serves as a kind of court of last resort for that nation's judicial system.

chusetts law applied to the action, a court would have to look not only to Massachusetts' statute of limitations but also its borrowing statute, Mass.Gen.Laws Ann. ch. 260, § 9, which would direct the court back to the District of Columbia limitations period.

The District of Columbia statute of limitations applied by Judge Gasch, D.C.Code 12–301(7), sets a three year limit on contract actions. Judge Gasch ruled that the statutory period began to run on the breach of contract claim from the time the agreement with Habib was "terminated" by Rayserve in January, 1972, when payments stopped, or at the latest on February 18, 1972, when Rayserve informed MES that it regarded their contractual relationship as at the end. On Habib's tortious interference claim, governed by the three year statute of limitations provided by D.C.Code 12–301(8), Judge Gasch ruled that the statute began to run from the time injury resulted from the harmful acts—when Rayserve stopped making payments under the contract in January, 1972. As for plaintiffs' civil conspiracy claim, also governed by the three-year limit provided by D.C.Code 12–301(8), Judge Gasch held that an overt act causing damage starts the statutory period for the substantive underlying offense running, and that this occurred when the contract was terminated in January or February, 1972.

■ This case comes to us on appeal from a grant of summary judgment. Therefore we must determine if appellants failed to raise any "genuine issue as to any material fact", looking at the facts in the record in the light most favorable to the party opposing summary judgment. Recent cases in this Circuit indicate that we must be satisfied that the moving party has clearly established the appropriateness of summary judgment before affirming. *See, e. g., United States v. General Motors,* 171 U.S. App.D.C. 27, 518 F.2d 420 (1975); *Washington v. Cameron,* 133 U.S.App.D.C. 391, 411 F.2d 705 (1969).

The district court's reasoning depends on its view that the contract was effectively breached or terminated in its entirety in

January or February, 1972. There can be no doubt that Rayserve breached its obligations to make monthly payments to Habib under the contract at that time and that it purported to terminate the contract. Nevertheless, we think the district court erred as a matter of law in viewing the contract as indivisible and we think appellants raised a genuine issue of material fact by their allegations that Habib had performed under that portion of the contract as to which the statute of limitations had not run, and that Rayserve had paid commissions to Abdallah which would entitle appellant to a recovery.

■■ If the Habib contract was severable, then the January 1972 breach did not set the statute of limitations running as to all parts of the contract. Rayserve breached its obligation to pay $25,000 per year in consultant's fees to Habib in 1972 and any action arising out of this breach is now time-barred. But Rayserve's obligation to pay Habib one fifth of any commissions it paid to Abdallah was a severable portion of the contract.

The concept of severability is not authoritatively defined. Under the First Restatement of Contracts, comment (e) to § 266(3) described it as follows:

A contract is divisible where by its terms, 1, performance is divided into two or more parts, and 2, the number of parts due from each party is the same, and 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party.

Tentative Draft Number 8 of the Second Restatement (1973) defines, in § 265, a severable contract as one "where the performance to be exchanged under an exchange of promises can be apportioned into corresponding parts of part performances so that the parts of each pair are properly regarded as agreed equivalents."

Looking at the Habib contract, we find two sorts of provisions: first, a provision that Habib identify for Rayserve's benefit a Saudi agent/sponsor; second, a set of vague provisions for Habib to provide ad-

vice for Raytheon's Saudi activities. The former was performed, apparently, even before the contract was signed, when Abdallah agreed to serve as Rayserve's resident agent. Compensation was due Habib under the contract in two very different ways: first, Habib was entitled to receive 20% of commissions Rayserve paid Abdallah; and second, Habib was entitled to $25,000 per year as a consultant fee. Finally, it should be noted that the durations of the two parts of the contract were different. Rayserve's obligation to pay Habib money based on its payments to Abdallah was to continue for so long as Rayserve made payments to Abdallah; while the $25,000 per year consultancy fee was due only for so long as the Abdallah contract remained in force. In our view, the commission-splitting portion of Habib's compensation represented his reward for securing a "Saudi sponsor/agent" when Rayserve was paid for the Hawk Missile System, and the $25,000 per year consultancy fee represented a retainer towards Rayserve's use of Habib's advice on Saudi business conditions. The former was to be paid only on certain conditions; the latter compensation was due even if Habib performed no services. Moreover, the levels of compensation are appropriate—the value of Habib's vague agreement to supply advice is reflected by the $25,000 per year fee, which in the context of a major arms manufacturer's dealings with the Saudi Arabian market must be considered as almost a token payment. By contrast, the compensation due Habib for the important service he might perform in actually securing a valuable contract is set at 1.2% of gross sales, a figure which in this case might run into several million dollars.

Thus the contract provisions are best regarded as severable. When Rayserve stopped making monthly payments in January, 1972, it breached the part of the contract providing for a consultancy relationship. Habib's cause of action for this breach accrued at that time.[4] Any action based on breach of this portion of the contract is now time-barred.

But as to the commission portion of the contract we reach a different conclusion. Taking the facts alleged by Habib to be true, Habib performed his obligation, to locate a Saudi agent, under this portion of the contract in 1971. This led to a signing of a contract in 1974. Habib alleges that the earliest possible delivery date for a Hawk Missile System sold in 1974 was mid-1975. Since Abdallah's right to his commissions did not mature until Raytheon received payment on delivery, and since Habib's right to his share of Abdallah's commission did not accrue until Abdallah was actually paid, it is clear that Rayserve could not have breached its obligation to Habib until the date of payment for the missiles, or no earlier than mid-1975.[5] Under this series of assumptions,[6] a suit instituted in February 1978, would not be barred under

4. Thus we reject appellant's argument that the doctrine of fraudulent concealment tolled the running of the statute of limitations. Appellees' alleged breach of the consultancy portion of the contract was not concealed, and we need not decide whether the fraudulent concealment argument is applicable to the breach of the obligation to pay part of the commission payments to Habib because on the facts alleged by Habib an action based on this breach would be timely without the benefit of the doctrine invoked.

5. The record does not reveal whether the Hawk Missiles at issue were delivered and paid for by Saudi Arabia.

6. We do not agree with Judge Gasch that a reading of *Afshar v. Procon, Inc.*, 442 F.Supp. 887 (SDNY 1977), supports his view that the Habib contract was non-severable and was breached in early 1972 in its entirety. The

memorandum opinion of the *Afshar* court does not state enough facts to allow extended discussion of that case, but it is clear from the language of the opinion that the case was very different from the one at bar:

[P]laintiff recognizes that his agency agreement with Procon contemplated continued efforts on his own part, even after a contract with respect to oil refineries in Iran was obtained. This was not a situation in which the agency relationship resulted in severable contracts in Iran, with respect to each of which plaintiff was owed commissions.

442 F.Supp. at 889. Habib owed no continuing efforts under the contract with regard to an item such as the Hawk Missile System once it was sold to Saudi Arabia. Nor could Rayserve unilaterally terminate its obligation to pay Habib a commission once he had performed.

the District of Columbia's three year statute of limitations.[7]

In agreeing with the district court that the three year statutory period is the applicable one, we do not pass on the district court's construction of the two contracts as meaning that only the provisions on commission-splitting were to be read together. Rather, we base our agreement on the district court's third reason for applying the District of Columbia's statute. It is clear that even if the choice of law clause of the Abdallah contract were effective in an action based on the Habib contract, a court should look to all the laws of Massachusetts, including its borrowing statute, Mass.Gen. Laws Ann. ch. 260, § 9, which would operate in this case to refer a court back to the statute of limitations of the state of plaintiff's residence, here, the District of Columbia.[8]

We deal next with a number of subsidiary contentions argued by the parties on appeal. Appellees argue that Habib's failure to take discovery pursuant to FRCP 56(f), which allows discovery to a party opposing summary judgment for the purpose of developing facts necessary to his motion in opposition, is a reason for affirming the result below. We do not agree. Although appellant might have been better advised to have conducted discovery and developed his facts more fully, FRCP Rule 56(f) is clearly discretionary and gives the district court two options when a party opposing summary judgment cannot present in his affidavit "facts essential to justify his opposition": the first is to deny the summary judgment motion, and the second is to allow discovery. Of the facts alleged by Habib in the chain of reasoning reproduced above, only one was alleged in a vague way—the assertion that Abdallah

had received payments from Rayserve. However, it is unlikely that discovery on this point would have produced anything of value. In their motion favoring summary judgment, Rayserve and Raytheon denied making any such payments, and there is no reason to believe that Abdallah could have been compelled to a deposition on the subject, or to answer interrogatories.

Appellees also argue that appellant failed to make his affidavit in opposition to summary judgment specific enough to satisfy FRCP 56(e) and Local Rule 1–9(h). Rule 56(e) provides that a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." We do not believe appellant failed this general test. As already stated, the element in appellant's chain of reasoning that was left vague in his motion opposing summary judgment was the question of whether payments had been made to Abdallah. Since this involved secret and perhaps illegal payments by a major corporation to a foreign prince thousands of miles away in a country known for its secretiveness, we do not think that appellant can reasonably be faulted for a lack of specificity on this matter.

Rule 1–9(h) of the Local Rules of the District Court of the District of Columbia provides that parties file "statements of issues" when summary judgment is requested. It provides that such statements "shall include therein references to parts of the record relied on to support such statement." Appellant's key assertions—that he was familiar with the way business is done in Saudi Arabia and that he had recently spoken to unnamed individuals in that country regarding the possibility that Abdallah had received payments from Rayserve, and that on these grounds he was prepared to affirm

7. Of course, a trial might well reveal that the factual assumptions necessary to this chain of reasoning cannot be proven. But this is a matter for the finder of fact. On the facts as alleged on the motion for summary judgment, it seems to us that the plaintiffs did indeed raise triable issues of material fact under a theory of the case not barred by any applicable statute of limitations.

8. Appellant's argument that the Massachusetts borrowing statute applies only to out-of-state *defendants* has no merit. The heading of the section of a statute is not controlling when it contradicts the plain meaning of the words of the law, particularly where, as here, the error is easily explained by reference to legislative history. Moreover, courts have applied this statute to out-of-state plaintiffs in the past. *See, e. g., Sylvania Electric Products, Inc. v. Barker*, 228 F.2d 842 (1st Cir. 1955).

that it was "impossible" that Abdallah had not received payments from Rayserve—narrowly pass this test. It is true that appellant had developed no information in the record to support this assertion. But, for reasons we have stated, it would be unfair under the circumstances of this case to hold appellant to as high a degree of specificity as would be required in a case which did not depend on the actions of royal personages in desert kingdoms and the alleged secret payments of a U.S. corporation. These matters are, of their nature, shrouded in secrecy, and the requirements of the rules of civil procedure should not in this case prevent appellant from presenting his case at a trial after suitable discovery proceedings.

Because of our conclusions it is unnecessary for us to pass on various other points raised by the parties, including the materiality of the breach and appellant's alleged failure to plead fraudulent concealment with the requisite specificity.[9]

. Finally, we note that if a trial is held in this case and the plaintiff establishes a breach of contract, it may then be appropriate for the court to consider whether or not any enforcement of the contract at issue here is consistent with the public policy of the United States. Neither party has raised this issue in the litigation to date. Rayserve and Raytheon deny making any payments to Abdallah. It appears on the face of the record that the percentage commissions, if a trial shows they are owed to Habib, may have been related to questionable payments made to a high government official of a foreign country. In recent years, though not necessarily at the time these contracts were entered into or at the time the payments were allegedly made,

such payments have been made illegal in most circumstances by Congress. *See* the Foreign Corrupt Practices Act of 1977, Pub.L. 95–213, 91 Stat. 1494, 15 U.S.C.A. §§ 78dd–1–2 and 78m(b) and 78ff as amended; the Domestic and Foreign Investment Improved Disclosure Act of 1977, Pub.L. 95–213, 91 Stat. 1498, 15 U.S.C.A. §§ 78m(g) and (b), and 78m(d) and 78o as amended. We do not intend by anything we have said in this opinion to suggest an answer to the question of whether or not any payments made by Rayserve on account of having received payment for the Hawk Missile System can form the basis for a contractual recovery by the appellants in the federal courts.

*Affirmed in part, reversed in part and remanded for further proceedings.*

---

**9.** Appellees suggest that the letter of February 18, 1972 can be viewed as a breach by virtue of anticipatory repudiation, thus beginning the running of the statute of limitations. Even if we agreed that the February 18 letter is unambiguous enough to qualify as an anticipatory breach, our conclusion that the commission payment portion of the contract was severable means that appellees' argument on this point must be rejected. As we have pointed out, Habib alleges that he had fully performed with regard to the commission payment portion of the contract either before or soon after the contract was signed; in either event, the contract had become "unilateral" long before the time of the "repudiation" of February 18, 1972. And "it is one of the established limits on the doctrine of 'anticipatory breach' that an obligor's repudiation alone . . . gives rise to no claim for damages at all if he has already received all of the agreed exchange for it." Rest. (2d) of Contracts, Tent.Draft No. 9 (1974), section 277 (comment (c)); *accord*, Rest. of Contracts, section 318 (doctrine of anticipatory breach does not apply to unilateral contracts, or contracts that have become unilateral by the time of repudiation) and comment (e) (1932).