**SVEN SALEN AB Plaintiff,**

v.

**JACQ. PIEROT, JR., & SONS, INC., Defendant.**

No. 82 Civ. 1161 (ADS).

United States District Court, S.D. New York.

March 18, 1983.

Haight, Gardner, Poor & Havens by John J. Reilly, Shelia T. Cain, New York City, for plaintiff.

Burlingham, Underwood & Lord by Michael Marks Cohen, Lizabeth L. Burrell, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

In this action jurisdiction rests upon diversity of citizenship, though the facts carry a maritime flavor. Plaintiff Sven Salen AB is a Swedish corporation with its principal place of business in Sweden. Defendant Jacq. Pierot, Jr., & Sons, Inc.

("Pierot") is a New York corporation. Both parties are in the business of ship brokerage, engaged in arranging for the sale, purchase, and construction of ships. Plaintiff seeks damages for breach of an alleged cobrokerage agreement, and recovery in quantum meruit. Defendant has moved for judgment on the pleadings based upon the statute of frauds as well as the statute of limitations. For the reasons stated below, the motion is denied.

This dispute has its genesis in an innocuous four-line telex from Pierot to Sven Salen, dated March 21, 1974 (Defendant's Exhibit A):

PLS ADVISE PRICE AND DELIVERY POSITION FOR 1 TO 4 LPG–CARRIERS OF ABT 75.000 CBM IN POLAND. UNDERSTAND HOEGH JUST PLACED 2 ORDERS AT ABT USD 42.-500.000.

PLS MAIL SPECS/PLANS.

Pierot thus requested information (price and delivery specifications) regarding the construction of from one to four liquid petroleum gas-carrying (LPG) vessels in Poland. The request, as the parties stipulate, concerned a particular manufacturer, Centromor, a Polish import/export organization, with the vessels to be constructed at the Gdansk Shipyard.

Sven Salen responded to the request in a telex dated April 3, 1974, stating that no price indication was obtainable, that direct negotiations with the Poles would be necessary, and inquiring whether Pierot's client would be willing to travel to Poland. (See Defendant's Exhibit E). Pierot replied that, based on past experiences with Poland, Pierot would require at least a price indication and vessel description before recommending that its client travel to Poland. Pierot's clients were the Northern Natural Gas Co. of Omaha (NNG), and Marine Transport Lines (MTL). The plan at that point was for MTL to purchase the vessels, and then to charter them to NNG on a long-term basis.

On April 8, 1974, Sven Salen telexed to Pierot a price quotation of $45 million per vessel, with vessel description and payment

terms to be forthcoming. Sven Salen also asked Pierot to provide flag and class information. These inquiries were promptly answered by Pierot in a telex also dated April 8, 1974. (*See* Defendant's Exhibits F, G). Sven Salen claims it then orally informed Pierot that a firm price and vessel description could not be obtained until the end of May 1974, due to difficulties caused by Poland's review of its five-year plan. On April 17, 1974 Pierot requested that Sven Salen expedite forwarding price and vessel specifications. Sven Salen's response was a letter dated April 22, 1974, which described a "General Arrangement Plan and Brief Technical Specification." (*See* Defendant's Exhibits S, Q).

Toward the end of the period covered by these communications, Pierot apparently decided to deal directly with Centromor. (*See* April 17, 1974 telex from Pierot to Mr. Leon Korgul; Defendant's Exhibit T). Centromor responded by telex dated April 22, 1974, urging that Pierot contact a Polish trade mission which then happened to be in New York seeking to develop business. Pierot contacted the mission in New York, and, according to Pierot, the mission gave firm price and vessel specifications. In fact, an April 23, 1974 letter from Centromor to Pierot contains a firm offer for two vessels, with price, payment, delivery terms and vessel specifications. (*See* Defendant's Exhibits V, W). Pierot negotiated further with the mission both by telex and on a visit to Poland on May 15, 1974. These direct negotiations culminated in a letter of intent and subsequent contract, under which NNG became contract purchaser, rather than MTL. The contracts were signed in New York on June 27, 1974.

Meanwhile, on May 3, 1974, Sven Salen telexed Pierot requesting that it be permitted to participate in the negotiations. (Defendant's Exhibit B). Pierot responded on May 7, 1974, recounting the events, noting Sven Salen's alleged inability to provide information promptly, and rejecting Sven Salen's request to participate. (*See* Defendant's Exhibit H). Sven Salen subsequently demanded, without result, its share of the commission during June, July, and August of 1974.

## I.  *Statute of Limitations*

Plaintiff commenced this suit on February 25, 1982. Under New York CPLR § 213(2) (McKinney 1972) a contract action must be commenced within six years of the date on which the underlying claim accrued. While assuming arguendo that the parties entered a valid cobrokerage agreement sometime during March and April 1974, defendant Pierot argues that § 213(2) bars relief because Sven Salen's claim, if any, accrued either on May 7, 1974, the date Pierot rejected Sven Salen's request to participate, or on June 27, 1974, the date the shipbuilding contracts were signed in New York. Plaintiff, on the other hand, asserts that no claim accrued until Pierot received its commission from the principals. The exact date at which Pierot received its commission is not yet ascertained, but plaintiff alleges that at least a portion, if not all, of the commission was paid to Pierot sometime after February 25, 1976, within six years of this action.

A claim accrues when the potential plaintiff is first able to maintain the cause of action in question. *United States v. Skidmore, Owings & Merrill,* 505 F.Supp. 1101, 1104 (S.D.N.Y.1981); *Afshar v. Procon Inc.,* 442 F.Supp. 887, 890 (S.D.N.Y. 1977). In a contract case the plaintiff is generally able to maintain a cause of action as soon as the defendant breaches the contract. *Schmidt v. McKay,* 555 F.2d 30, 34 (2d Cir.1977); *Skidmore,* 505 F.Supp. at 1104 n. 3. Here plaintiff Sven Salen asserts that it could not have maintained a cause of action for nonpayment of the cobrokerage fee until Pierot had received its commission from the principals, because under the alleged cobrokerage agreement Pierot had no duty to pay Sven Salen until Pierot had been paid. Pierot claims that under the assumed agreement it had a duty to pay Sven Salen as soon as the shipbuilding contracts were signed; moreover, Pierot argues, Sven Salen could have sued Pierot even before the signing of the contracts because Pierot's rejection of Sven Salen's

request to participate constituted a breach of the agreement under the doctrine of anticipatory repudiation.

■ Pierot's argument concerning anticipatory repudiation lacks merit. An anticipatory repudiation occurs "whenever there is an 'overt communication of intention' not to perform." *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 150, 379 N.E.2d 1166, 1168, 408 N.Y.S.2d 36, 38 (1978). The question whether the May 7, 1974 telex from Pierot to Sven Salen constituted an anticipatory repudiation under this standard, however, does not affect the statute of limitations issue. The victim of an anticipatory repudiation has an election. He may sue at once, treating the repudiation as a present breach; or he may await the time of performance and, if performance is not forthcoming, sue at that later time. If he chooses to sue later rather than earlier, the statute of limitations does not begin to run until later. Weinstein, Korn & Miller, *New York Civil Practice* ¶ 213.10, at 2–240 (1981) (citing *Ga Nun v. Palmer,* 202 N.Y. 483, 492–93, 96 N.E. 99, 102 (1911)); *see Police Benevolent Ass'n v. State,* 79 Misc.2d 334, 336, 358 N.Y.S.2d 280, 283 (Ct.Cl.1974).

■ The question remains whether Pierot's presumed duty to pay Sven Salen arose and was breached when Pierot was paid by the principals or when the shipbuilding contracts were signed. In the area of real estate brokerage, a broker's right to a commission is established when the buyer and the seller execute a contract, if not sooner. *See Geller v. New England Industries, Inc.,* 535 F.2d 1381, 1385 (2d Cir.1976) (cases discussed). Unless such a condition is made part of the brokerage agreement, the broker's right to compensation does not depend on the seller's receipt of the selling price. *Id.* On the other hand, a real estate broker's duty to share a commission pursuant to a cobrokerage agreement does not mature until actual receipt of the commission by the primary broker. "[I]n order to entitle one broker to receive from another broker on an agreement to divide commissions on the sale of real property, *the commission must have been actually received by the broker whom it is sought to charge with liability* . . . ." *White v. Robinson,* 153 ·App.Div. 776, 777, 138 N.Y.S. 992, 993 (1st Dep't 1912) (emphasis added). *See* 11 N.Y. Jur.2d Brokers § 102 (1981) (citing *White v. Robinson* ); *Annot.,* 71 A.L.R.3d 586, 606–10 (1976). While some courts have ruled that, under particular circumstances, a secondary broker may be entitled to recover even though the primary broker has not been paid, the New York view is the more prevalent. 71 A.L.R.3d at 609 n. 63.

■ The wisdom of applying this real estate brokerage concept to the shipbuilding area is unclear. The real estate rule appears apposite, since it seems unsound to require a broker in any industry to share a commission it does not ultimately receive. On the other hand, the parties have presented little evidence of possibly relevant cobrokerage customs and usages in the shipping trade. In any event, the real estate cobrokerage rule at least establishes a presumption in favor of not requiring shipbuilding brokers to share with their cobrokers commissions they may never receive. This presumption plainly entitles Sven Salen to a denial of Pierot's motion for judgment on the pleadings. *Cf. Habib v. Raytheon Co.,* 616 F.2d 1204, 1209–10 & n. 7 (D.C.Cir.1980) (assumptions concerning terms of brokerage contract preclude statute of limitations dismissal on summary judgment motion).

■ Plaintiff's quantum meruit claim for services rendered in connection with procuring the Polish agency's cooperation in the shipbuilding arrangement is also not barred by § 213's six-year statute of limitations. Unjust enrichment is an essential element of a quantum meruit or other quasi-contract claim. *See* Farnsworth, *Contracts* § 2.20 (1982). In many instances, enrichment occurs at the time services are rendered; here, however, the services allegedly rendered by Sven Salen do not appear to have enriched Pierot until Pierot actually received its commission from the principals. Thus, notwithstanding that quantum meruit claims generally accrue when services are rendered, *see Rappaport*

*v. Blank,* 66 App.Div.2d 690, 411 N.Y.S.2d 239 (1st Dep't 1978), the quantum meruit claim in this case could not have been maintained and therefore did not accrue until Pierot received its commission.

## II. *Statute of Frauds*

██ Defendant also relies on New York's statute of frauds as a bar to this action. N.Y.Gen.Oblig. Law § 5–701(a)(10) (McKinney 1982). In *Dura v. Walker, Hart & Co.,* 27 N.Y.2d 346, 267 N.E.2d 83, 318 N.Y.S.2d 289 (1971), however, the Court of Appeals examined the legislative history and purpose behind the statute of frauds and held that it is inapplicable to agreements between two finders to share commissions that one of them is to receive from a principal. The evils sought to be remedied by the statute of frauds are, in the Court's view, uncommon in cobrokerage situations:

> It is ... manifest that there is ... no need to protect one broker or finder against the unlikely and rare claim of another. Nor was such protection within the contemplation of the lawmakers; ... the statute was aimed at the protection of principals or employers against claims for brokers' or finders' fees and, indirectly, at protecting brokers and finders in their dealings with principals not with one another.

27 N.Y.2d at 350, 267 N.E.2d at 84–85, 318 N.Y.S.2d at 291–92 (footnote omitted).

Pierot seeks to distinguish *Dura* on its facts, asserting that in *Dura* the plaintiff approached the defendant and later alleged an express agreement to share commissions on specific and definite terms. Who approached whom seems irrelevant, however, and the terms in *Dura*—to "work as a finder on a participating basis"—were exceedingly general. 27 N.Y.2d at 348, 267 N.E.2d at 83, 318 N.Y.S.2d at 290. Nor is the *Dura* rule inapplicable because it applies to cobrokerage agreements only insofar as such agreements are akin to joint ventures. *Haskins v. Loeb Rhoades & Co.,* 52 N.Y.2d 523, 525, 421 N.E.2d 109, 110, 438 N.Y.S.2d 989, 990 (1981) (per curiam). In *Haskins,* plaintiff, as an employee of the defendant

being paid for her regular services, could not allege "evidentiary facts which indicate the existence of any enterprise even remotely resembling a joint venture." 52 N.Y.2d at 525, 421 N.E.2d at 110, 438 N.Y.S.2d at 990. Here, by contrast, where plaintiff and defendant are competitors, the arrangement alleged is very much like a joint venture, even to the point of Sven Salen's being required to absorb any losses caused by the cobrokers' failure to earn a commission. The arrangement at issue therefore fits the *Dura* exception, if the facts are read favorably to plaintiff. Defendant's reliance on *Allen Chase & Co. v. White, Weld & Co.,* 311 F.Supp. 1253 (S.D. N.Y.1970) is misplaced inasmuch as that case was decided before the Court of Appeals' decision in *Dura,* as well as after a full trial.

Discovery on the merits shall proceed, and the parties shall appear for a pretrial conference in Courtroom 36 on April 15, 1983 at 10:30 a.m. The motion for judgment on the pleadings is denied.

SO ORDERED.