The KEEFE COMPANY, Appellant,

v.

AMERICABLE INTERNATIONAL, INC., Appellee.

No. 98–7093.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1999.

Decided March 12, 1999.

Griffith L. Green argued the cause for appellant. With him on the briefs were Thomas C. Green and Mark D. Hopson.

Robert P. Parker argued the cause for appellee. With him on the brief was Gaela K. Gehring–Flores. Swati Agrawal entered an appearance.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

WALD, Circuit Judge:

The Keefe Co. ("Keefe"), a self-described "governmental relations/public affairs firm," Joint Appendix ("J.A.") at 428, entered into a contract in 1985 with Americable International, Inc. ("Americable"), a Florida-based operator of cable television facilities, to help Americable break into the burgeoning business of supplying cable television to United States military installations. Keefe claims that in 1988, Americable stopped making payments due under the contract. Americable argues that the contract is void because it violates a statutory prohibition of contingent fee arrangements for the procurement of government services, and also, that Keefe is barred from bringing this suit by the District of Columbia's three-year statute of limitations on breach of contract claims. On Americable's motion for summary judgment, the district court ruled that some of Keefe's claims were not time-barred, but granted summary judgment to Americable on the grounds that the contract violated the statute. For the reasons stated below, we disagree that the contract is invalid as a matter of law, and certify the statute of limitations issue to the District of Columbia Court of Appeals.

## I.

In a letter agreement executed by Keefe and Americable on September 4, 1986,[1] Keefe agreed to provide Americable with "consulting, advisory, liaison, marketing, negotiating and related services which may be required in obtaining contracts to install cable television (CATV) service systems to United States Government installations both in the United States and abroad." J.A. at 8. Paragraph 4 of the letter agreement states in relevant part:

In the event that [Americable is] awarded a contract to install a CATV system on a U.S. Government installation after the date

1. The first agreement between the parties was executed on September 24, 1985. We will refer only to the more recent agreement, which does not materially differ from the earlier one.

of this agreement, The Keefe Company shall be entitled to receive fees as follows: (A) The Keefe Company shall be paid a one-time fee of $10.00 for each "home passed." "Home" means a single-family residence. BOQ's, barracks, multi-family residential buildings and the like shall be considered as one home....

(B) The Keefe Company shall receive 3% of the gross monthly subscriber revenues received by the system from and after 90 days after initiation of service. Such payment shall be made once a month on the first of the month and shall continue until sale of the system. In the event the Government Installation is closed or [Americable] ceases to provide services to said Government Installation [Americable's] obligation to pay The Keefe Company shall cease. Termination of this agreement as hereinafter provided shall not affect The Keefe Company [sic] right to said fee or [Americable's] obligation to pay the same on bases where a service agreement has been executed and a CATV system has been constructed by [Americable].

J.A. at 9. In addition, if Americable sold a cable system, Keefe was to receive 2 percent of the gross sale price. Keefe also agreed not to represent any other cable company while working for Americable. *Id.*

■ Keefe alleges that in 1988, Americable stopped making payments under paragraphs 4(A) and 4(B) of the letter agreement. Americable's version is that the relationship "soured." J.A. at 411 (Defendant's Statement of Material Facts Not in Dispute). Americable now argues that the entire contract is void because it violates the law against contingent fee arrangements for the procurement of government services. That law, 41 U.S.C. § 254(a), provides that:

> Every contract ... shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit to secure such contract

upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting ... bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business, for the breach or violation of which the Government shall have the right to annul such contract without liability or in its discretion to deduct from the contract price the full amount of such commission, percentage, brokerage, or contingent fee.

As we have previously held, "[a] compensation contract in violation of the required warranty will not be enforced by the courts." *Le John Mfg. Co. v. Webb*, 222 F.2d 48, 50 (D.C.Cir.1955) (violation of materially identical warranty previously required by executive order); *accord Quinn v. Gulf & Western Corp.*, 644 F.2d 89 (2d Cir.1981).

■ Keefe argues that it falls within the "bona fide agency" exception to the warranty requirement. The applicable Federal Acquisition Regulations define "bona fide agency" as "an established commercial ... agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence." 48 C.F.R. § 3.401 (1986).[2] "Improper influence" is defined as "any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter." *Id.* Finally, the following guidelines "describe circumstances ordinarily existing in acceptable arrangements in which the agency is bona fide ...":

> (1) The fee should not be inequitable or exorbitant when compared to the services performed or to customary fees for similar services related to commercial business.
>
> (2) The agency should have adequate knowledge of the contractor's product and business, as well as other qualifications

---

**2.** Although these are the primary governing regulations, the parties also cite other subparts of the Code of Federal Regulations that are identical to 48 C.F.R. §§ 3.400–3.410, *see, e.g.,* 48 C.F.R. § 52.203–5 (1984), *cited in* Keefe's Brief (K. Br.) at 15. For the sake of consistency we refer to subpart 3.4 throughout our opinion.

necessary to sell the products or services on their merits.

(3) The contractor and the agency should have a continuing relationship or, in newly established relationships, should contemplate future continuity.

(4) The agency should be an established concern that has existed for a considerable period, or be a newly established going concern likely to continue in the future. The business of the agency should be conducted in the agency name and characterized by the customary indicia of the conduct of regular business.

(5) While an agency that confines its selling activities to Government contracts is not disqualified, the fact that an agency represents the contractor in Government and commercial sales should receive favorable consideration.

*Id.* § 3.408–2(c).

The district court rejected the notion that Keefe qualified as a bona fide agency. The court applied a two-part test: first, the court held that there is a "threshold requirement that an entity not use improper influence"; and second, that the federal regulations establish additional criteria for evaluating the applicability of the bona fide agency exception. *Keefe Co. v. Americable Int'l, Inc.*, Civ. No. 94–1568, at 5 (D.D.C. May 11, 1998). The court awarded summary judgment to Americable because Keefe failed the threshold test. "Principally, it is Keefe's efforts at using congressional contacts to advance Americable's business that steer the Court to this conclusion," the district court found. "Keefe arranged to have two congressmen—in their capacities as members of the House Appropriations Committee on Military Construction—write letters lauding Americable to the commanders of bases that Americable wished to service. These letters were sent during the procurement process and can be read to suggest that the bases hire Americable based on reasons other than the merits of their work." *Id.* at 6–7.

The district court was referring to identical letters jointly signed by Reps. Vic Fazio and Bill Lowery and addressed to commanders of naval bases in California (three of these letters appear in the record). J.A. at 305–07. Each letter began by explaining that the congressmen were writing about requests for proposals (RFPs) that had recently been issued for interactive-capable CATV services at the naval bases. The letters continued:

As Members of the House Appropriations Subcommittee on Military Construction we are particularly concerned about quality of life programs for servicemen and women and their families. We are pleased therefore that the Navy is pursuing the installation of cable TV at this base. Given the expanded viewing opportunities that cable afford the subscribers, we feel that this will be of great benefit to those who live and work on Navy facilities.

In view of the scope of this RFP, we wanted to let you know that one of the firms which has submitted a proposal, Americable International, Inc. has earned an excellent reputation for the service it provides at other military bases throughout the country. This company which has been awarded contracts at Vanderberg [sic] AFB, Homestead AFB, Roosevelt Roads Naval Station and all five Navy bases in San Diego[3], provides state-of-the-art equipment and the type of organization needed to provide quality service for military personnel and their families.

We share your desire to provide our service families with a top notch cable system at the lowest possible price. Thus, we hope that you will give the Americable proposal every consideration.

J.A. at 305 (letter to Captain J.W. Cook, Navy Public Works Center, August 26, 1986). Other letters, which were not discussed by the district court but appear in the record, provide further detail of Keefe's contacts with politicians on behalf of Americable. Most of these contacts seem to have been initiated by Eli Feinberg, a Florida consultant who introduced Americable's chairman, Charles Hermanowski, to Keefe officers, and

---

**3.** The congressmen sent their first letter to the naval commander in San Diego. Americable was eventually awarded the contract for the San Diego installations, and this fact appeared in the two subsequent letters that appear in the record. J.A. at 306, 307.

who entered into a contract with Keefe to help in its representation of Americable. *See* J.A. at 33. In May 1986, Feinberg sent a note to Rep. William M. Lehman, the congressman for Americable's district. Feinberg wrote, "It was good talking to you today and I hope this note finds you and Joan in the best of health," and he then mentioned that Americable was vying for the cable franchise at the McClellan Air Force Base in California. Feinberg asked Rep. Lehman if he would ask Rep. Fazio, whose district included McClellan, "to put in a good word for Ameri–Cable International [sic], as your constituent, with the Base Commander." J.A. at 304. In addition, three letters appear in the record that were sent to Feinberg: one from Rep. Dante Fascell of Florida, one from Sen. Lawton Chiles' administrative assistant, and one from Sen. Chiles. J.A. at 308, 309, 311. The letters address the fact that Feinberg had contacted Fascell's and Chiles' offices regarding Americable's protest of a contract that was awarded to another cable provider at the Guantanamo Naval Station. It appears from these letters that Rep. Fascell and Sen. Chiles agreed to contact, and did contact, the General Accounting Office (GAO) regarding Americable's protest. *See also* J.A. at 310, 312 (letters from GAO to Rep. Fascell acknowledging his correspondence).

Americable argues that this series of correspondence, as the district court concluded, "can be read to suggest" that Keefe improperly tried to use its political connections so "that the bases [would] hire Americable based on reasons other than the merits of [Americable's] work." "Most importantly, the district court relied on the uncontradicted fact that Keefe invited the intervention of influential Congressmen into the procurement process. That fact is sufficient to trigger the contingent-fee prohibition...." Americable's Brief (Am. Br.) at 14. In addition to letters from politicians, Americable points to testimony in the record showing that Keefe met with the staff of Sen. Murkowski regarding Alaska military installations and used a personal connection to gather information about cable outlets at Nellis Air Force Base near Las Vegas. Am. Br. at 8–9.

We disagree that this evidence is sufficient to support summary judgment on Americable's argument that Keefe intended to "induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter." 48 C.F.R. § 3.401. "A court may dispose of a case on summary judgment before trial only where there is no genuine issue as to any material fact." *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1465 (D.C.Cir.1990) (citing Fed. R.Civ.P. 56(c)). "The standard test for summary judgment is 'whether a fairminded jury could return a verdict for the [nonmovant] on the evidence presented.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Where more than one plausible inference can be drawn from the undisputed facts, summary judgment is not appropriate. *See United States v. Spicer*, 57 F.3d 1152, 1160 (D.C.Cir.1995). However, if "'[u]ndisputed facts ... point unerringly to a single, inevitable conclusion,'" summary judgment would be warranted. *Id.* (quoting *In re Varrasso*, 37 F.3d 760, 764 (1st Cir.1994)). Finally, "[i]n reviewing a district court's decision on a summary judgment motion, our role is" the same as the trial court's. *Shields*, 895 F.2d at 1465.

As this case is an appeal from a grant of summary judgment to Americable, in order to sustain that judgment we must conclude that Americable has succeeded in showing that an inference of improper influence is the only reasonable one to be drawn from this set of circumstances. We cannot so conclude. Even if, as the trial judge found, the letters from Reps. Fazio and Lowery "can be read" to suggest that Keefe intended to exercise "improper influence," it is just as plausible that the letters "can be read" to suggest that Keefe merely used its knowledge of the political process to press Americable's case "on the merits." The letters from Reps. Fazio and Lowery, as well as Feinberg's letter to Rep. Lehman, all focus (at least in part) on Americable's qualifications to provide cable service at military bases. The letters from the GAO to Rep. Fascell and Sen. Chiles acknowledge the lawmakers' interest in Americable's bid protest but no-

where suggest the use of any improper pressure to resolve the protest in a certain way.[4] It is true, as the district court noted, that Keefe cannot win its case by resting on the absence of evidence that it actually exerted improper influence. Rather, the definition of "improper influence" in the regulations requires us to look to the *tendency* of Americable's and Keefe's contractual relationship, as well as the tendency of Keefe's business practices, to germinate improper influence. *See* 48 C.F.R. § 3.401. Even so, we do not find that the contract and Keefe's activities on behalf of Americable give rise to only one reasonable inference—that Keefe "propose[d] to exert improper influence to solicit or obtain Government contracts." *Id.*

Although the district court did not reach the second part of its test for the bona fide agency exception, applying the factors listed in the FARs, we note that Americable does not argue that Keefe's fees were "inequitable or exorbitant," *id.* § 3.408(c)(1); or that Americable and Keefe did not contemplate a "continuing relationship," *id.* § 3.408(c)(3); or that Keefe is not an "established concern that has existed for a considerable period," *id.* § 3.408(c)(4). Instead, Americable argues that Keefe did not have adequate knowledge of the cable industry, *id.* § 3.408(c)(2), and that Keefe's only mission was to sell Americable to the government, *id.* § 3.408(c)(5). Americable folds these two arguments into one general objection: that Keefe's supposed lack of regular and specified duties shows that it was hired to curry influence with public officials, and not for its expertise in the cable industry and with business contracts. But as the Second Circuit observed in *Puma Industrial Consulting, Inc. v. Daal Assoc. Inc.*, 808 F.2d 982 (2d Cir.1987), "[t]he consideration and application of these enumerated factors can be meaningful only in light of the policies underlying § 254(a). The purpose of this warranty requirement is to 'protect government agencies against corrupting influences.'" 808 F.2d at 985 (quoting *Mitchell v. Flintkote Co.*, 185 F.2d 1008, 1010 (2d Cir.1951)). Applying the FAR factors to a case much like the one at bar, the Second Circuit in *Puma*

upheld a district court judgment in a consulting firm's favor. The court found that the bona fide agency exception applied to a firm whose business was assisting small companies in obtaining government contracts and who had helped a textile wholesaler obtain government business by, among other things, gathering information on bid proposals. "Puma is in the business of assisting small businesses in procuring contracts with the government and other agencies. There is not even a hint of the selling of governmental influence." *Id.* We think many of the same considerations apply here.

Americable argues, however, that the regulations should be read restrictively to permit contingent fee contracts to procure government services only when the performing party fits "into the narrow category reserved for technical and administrative experts," Am. Br. at 25, because that is what the common law presumption against contingent fee arrangements required. Even if that were what the common law required—and we are not at all sure it was so confined, *see generally ACME Process Equipment Co. v. United States*, 171 Ct.Cl. 251, 347 F.2d 538, 548–550 & n. 11 (Ct.Cl.1965) (common law adopted totality of the circumstances approach to evaluating the challenged relationship), *Le John*, 222 F.2d at 51 (restrictive approach of the common law nonetheless involves evaluating totality of the circumstances)—we find no support for this view in the statute or the regulations.

We therefore conclude that the district court erred in granting summary judgment to Americable on the ground that—as a matter of law—its contract with Keefe violated the statute against contingent fee contracts for obtaining government services.

## II.

Having decided that this case is not fit for summary judgment on the question of whether the contract violates public policy, we are still faced with another potentially determinative issue: whether all of Keefe's contract claims are barred by the District of Columbia's three-year statute of limitations on con-

4. We assume, without deciding, that Feinberg's     letters are attributable to Americable.

tract claims. *See* D.C.Code § 12–301(7). Keefe claims that Americable breached paragraph 4(A) of the September 4, 1986 letter agreement when Americable failed to pay Keefe the "one-time fee of $10.00 for each home passed"—that is, $10.00 for each military base resident connected to cable on all contracts Americable obtained at United States military installations—resulting in unpaid fees of $395,000. Complaint ("Compl.") ¶ 4. Keefe also claims that Americable breached paragraph 4(B) of the letter agreement, in which Americable had agreed to pay Keefe a monthly fee of 3 percent of the gross monthly subscriber revenues earned by Americable on the military contracts until the sale of the cable system, amounting to $870,000 in unpaid fees. *Id.* Keefe alleges that Americable stopped making payments to Keefe under both paragraphs some time in 1988; Americable avers that the "Keefe–Americable relationship soured in mid-to late–1987." J.A. at 411 (Defendant's Statement of Material Facts Not in Dispute).[5] Keefe brought this action in 1994.

Americable argues that the three-year statute of limitations has run on all of Keefe's claims because Keefe did not file suit to recover the one-time fees and the subscriber revenue fees within three years of the date the payments ended in 1988. Keefe responds that the contract should be viewed as one for installment payments. The law governing installment payments is that "the Statute of Limitations begins to run on each instalment [sic] when it becomes due and payable.... This is also true where a monetary obligation is payable in instalments." 18 *Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts* § 2926(C) (3d ed.1978). Thus, Keefe, argues, it should be able to recover for all payments due within three years of the time it filed suit. The district court agreed with Americable that Keefe was time-barred from bringing suit on Americable's failure to make the "one-time fee" payments because, by their nature, one-

time fees are not "installments"—they are due and owing only once—and these fees were due and owing six years before Keefe filed suit.[6] But the court also held that Keefe was not time-barred from bringing suit on the unpaid monthly subscriber fees because such fees were payable in installments. Americable appeals the latter ruling, arguing that its alleged failure to pay fees beginning in 1988 constituted a complete "termination" of the contract, thus triggering a single limitations period that ran from the date of termination.

We find there is no clear precedent in the decisions of the District of Columbia Court of Appeals. We therefore certify the following question of law to the District of Columbia Court of Appeals pursuant to D.C.Code § 11–723:

> Under District of Columbia law, and upon the facts described in this opinion, when parties have entered into a contract in which payment is due on the first of each month, *calculated as a percentage of the promisor's revenues from a specific service already rendered by the promissee,* does the limitation period begin to run separately on each missed payment, as is generally the case with installment contracts, or, does repudiation or breach of the contract as a whole trigger a single limitations period?

Americable argues that "termination of a contract to make a stream of payments does *not* establish a pattern of 'repeated breaches,'" as in an installment contract, because it is "a *single* breach of a contract to make a series of payments." Resp. Br. at 34 (emphasis in original). The local D.C. courts have not addressed this argument—or at least, not so recently or directly that we can discern a clear answer.

In one very early case, the plaintiff sued the estate of a woman who had promised to pay the plaintiff $50 a month for life in

---

5. Neither party provides details of this alleged termination. There is a vague allusion in the record to an instance in which Hermanowski communicated to Keefe that Americable was terminating the contract. *See* J.A. at 183 (testimony of Richard D. Shelby, former senior vice president of Keefe); J.A. at 592 (testimony of Eli M.

Feinberg, Florida lobbyist who assisted Keefe). But neither party raised this information before the district court, nor is it discussed in this appeal. We will therefore treat it as immaterial.

6. Keefe does not challenge this ruling.

exchange for services the plaintiff performed for the woman when she was alive. But the suit was filed more than five years after the payments had stopped—well outside the three-year limitation period. Nonetheless, the Court of Appeals of the District of Columbia opined: "[I]t is well settled that where a debt is payable in independent instalments [sic] the right of action accrues upon each as it matures, and if the obligee shall fail to commence his action until the statutory bar has intervened in the case of one or more instalments, he can only recover those not barred when his action was commenced." *Washington Loan & Trust Co. v. Darling*, 21 App.D.C. 132, 140 (App.D.C. 1903). In *Darling*, however, the court did not discuss the possibility that the contract had been repudiated or totally breached. Instead, the *Darling* court, directly applying the general rule of installment payments, concluded that the limitations period began to run at the time each payment was due and owing and that the plaintiff could therefore bring suit on unpaid installments for the previous three years.

In *Le John Mfg. Co. v. Webb*, 91 A.2d 332 (D.C.1952),[7] the court held that a contract identical to the one at issue—a contingent fee contract to procure government business, with payments for services based on a percentage of the business procured and payable in installments—can be viewed as an "ordinary installment contract." 91 A.2d at 335 (holding that plaintiff had to bring claims for all installment payments that were past due at the time he filed suit or be barred by *res judicata*; accordingly, plaintiff could not disaggregate his claims to avoid the $3,000 jurisdictional limit on cases brought in municipal court). But *Le John* does not advance the ball much, because the court again was not presented with the question of whether to treat the breach of an employment contract providing for monthly payments over an indefinite period of time as a total breach of the whole contract triggering one limitations period, or as a series of separate breaches for failure to make payments, each triggering its own limitations period. A

case cited with approval in *Le John*, *Goodwin v. Cabot Amusement Co.*, 129 Me. 36, 149 A. 574 (1930), held that a plaintiff who had received a judgment in an earlier suit for missed installment payments on an employment contract was not barred by *res judicata* from bringing another suit for *subsequently* missed payments. The defendant in *Goodwin* had argued that the plaintiff's judgment on the earlier suit was for total breach and accordingly encompassed all future damages and barred him from suing again on the same contract. The *Goodwin* court held that the plaintiff in his first suit had a "right to have chosen to proceed either on the basis of a total breach and in that action recover all damages, present and future, or to sue for the separate installments due at the time suit might be brought," 149 A. at 579, and found that the plaintiff had only sued for separate installments.

> Where an agreement provides for the payment of installments of money, suit may be brought for successive installments, if they are not paid as they become due, during the continuance of the agreement. . . .
>
> In view of . . . a clear intent to give the [plaintiff] the benefit of definite and regular payments of money at agreed periods, we find that the agreement is divisible in its terms, susceptible of successive breaches on failure to pay installments when due, and that each successive failure to pay under the agreement constitutes a fresh cause of action of which the plaintiff can avail himself if he chooses.

*Id.* at 579. *See also Davis v. Young*, 412 A.2d 1187 (D.C.1980) (holding with regard to a claim for unpaid wages under the Minimum Wage Act that "[i]n cases of periodic payment, such as wages, each payment date gives rise to a new claim"). This, of course, suggests that the promisee of installment payments, such as Keefe, may *choose* to bring suit on the payments due and owing instead of on the entire contract.

---

7. This case was the precursor to *Le John Mfg. Co. v. Webb*, 222 F.2d 48 (D.C.Cir.1955), discussed above. The District of Columbia Municipal

Court dismissed the earlier case for lack of jurisdiction, see *infra*.

More recently, in *Press v. Howard University*, 540 A.2d 733, 735 (D.C.1988), the Court of Appeals addressed the converse factual setting of *Darling* and *Le John*—a single, total breach of an employment contract. But the *Press* court was not presented with the argument that the contract could be viewed as providing for installment payments. The plaintiff in *Press* relied on *Davis* to argue not only that each missed salary payment stemming from the total suspension of his employment gave rise to a new limitation period, but further, that all missed payments for which the limitation periods had expired could still be recovered under a "continuing violation" theory. The *Press* court rejected this argument, holding that "[i]n the case before us [ ], the alleged breach of contract—the suspension—occurred only once...." *Id.* *Press* expressly rejected application of *Davis* on the grounds that *Davis* had nothing to do with the "continuing violation" doctrine; rather, it involved a "series of repeated acts occurring at different times, not a single act extending over a long period," *id.*, as the continuing violation doctrine would normally require. Moreover, the court noted that *Davis* did not involve a contract claim. Thus, *Press* did not precisely address the issue before us because Keefe is not arguing that Americable committed a "continuing violation"—only that the law governing installment payments should apply here.

In short, the *Press* scenario, where an employment contract was totally breached in a single instance, and the *Darling* scenario, where breach of an employment contract was viewed as a series of individual breaches of the duty to make installments, have not yet been interposed as competing arguments before the Court of Appeals. Thus, we do not know whether the *Davis–Le John–Goodwin* line of cases is available to Keefe, and we are compelled to certify the question for resolution. Appended to this certification are the briefs and portions of the district court record on summary judgment provided by the parties to this appeal.

### III.

For the reasons stated above, we vacate the judgment of the district court on the issue of the validity of the contract and remand for proceedings in accordance with this opinion and we certify the statute of limitations issue to the District of Columbia Court of Appeals for resolution.

*So ordered.*