The KEEFE COMPANY, Appellant,

v.

AMERICABLE INTERNATIONAL, INC., Appellee.

No. 99–SP–374.

District of Columbia Court of Appeals.

Argued Oct. 13, 1999.
Decided July 13, 2000.

Andrew E. Weis, with whom Thomas C. Green, Mark D. Hopson, Washington, DC, and Griffith L. Green, Falls Church, VA, were on the brief, for appellant.

Robert P. Parker, with whom Carl W. Hampe, Washington, DC, Gaela K. Gehring–Flores, Tacoma Park, MD, and Aseel M. Rabie, Washington, DC, were on the brief, for appellee.

Before TERRY and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

Pursuant to D.C.Code § 11–723 (1995), the United States Court of Appeals for the District of Columbia Circuit ("Circuit Court") has certified the following question to this court:

Under District of Columbia law, and upon the facts described in this opinion, when parties have entered into a contract in which payment is due on the first of each month, *calculated as a percentage of the promisor's revenues from a specific service already rendered by the promissee,* does the limitation period begin to run separately on each missed payment, as is generally the case with installment contracts, or, does repudiation or breach of the contract as a whole trigger a single limitations period?

*Keefe Co. v. Americable Int'l, Inc.,* 335 U.S.App.D.C. 118, 124, 169 F.3d 34, 40 (1999)(emphasis in original). We conclude that, on the facts presented to us, the limitation period on each missed monthly payment under the contract in question began to run separately, and we answer the certified question accordingly.

## I.

The facts may be summarized as follows.[1] In the mid–1980's, Keefe Co. ("Keefe") and Americable International, Inc. ("Americable") entered into a letter agreement by which Keefe agreed to assist Americable in obtaining cable television ("CATV") contracts with U.S. military bases. Paragraph 4 of the agreement set forth in three separate subparagraphs the compensation Keefe was to receive for each contract so acquired: (A) a one-time fee of $10.00 per "home passed," (B) 3% of gross monthly subscriber revenues received from 90 days after service initiation until sale of the system, payable once a month on the first day of each month, and (C) 2% of the gross sale price of the system when sold.

As to the monthly payments, paragraph 4(B) of the contract provided, "Termination of this agreement as hereinafter provided shall not affect the Keefe Company [sic] right to said fee or [Americable's] obligation to pay the same on bases where a service agreement has been executed and a CATV system has been constructed by the Company." Paragraph 4(C), pertaining to the 2% due on sale, contained a similar provision. The termination provision of the contract also stated more generally: "It is mutually understood and agreed that termination of this agreement shall not in any way affect The Keefe Company [sic] right to receive compensation for services performed pursuant to the terms and conditions of this agreement prior to the effective date of said termination where a Service Request Agreement has been executed and a cable T.V. system has been constructed by the Company."

The contract terminated sometime between 1987 and 1989.[2] In 1994, Keefe filed the instant suit in federal district court, alleging that Americable had failed to make $395,000 worth of "one-time" payments due in 1988, as well as missing $870,000 in monthly payments due between 1988 and 1994. Americable moved for summary judgment on multiple grounds, including that the statute of limitations had run in 1991, three years after the contract was first breached. *See* D.C.Code § 12–301(7) (1995)(creating three-year statute of limitations for actions on contract). As to the one-time payments, the district court ruled that the statute of limitations barred recovery since the payments were due in 1988. However, as to the monthly payments, it concluded that those were installment payments with individual statutes of limitation, such that only payments due more than three years prior to Keefe bringing suit were barred.[3] Americable's appeal of the latter ruling led to certification of the question now before us.[4]

---

1. These facts are taken from the Circuit Court opinion, the copy of the letter agreement provided to us by the parties, and undisputed representations of the parties in their briefs.

2. The terms of the contract permitted either party to terminate on ninety days written notice. According to the parties, their relationship "soured" in mid- to late 1987, Americable stopped making payments in 1988, and Keefe ceased all performance in 1989. Although it is not entirely clear how or when the contract was "terminated," both parties agree that it was, and the Circuit Court has deemed the details of the event immaterial since the issue was not raised in either the district court or on appeal. *See Keefe, supra,* 335 U.S.App.D.C. at 124 n. 5, 169 F.3d at 40 n. 5. In the absence of any indication that either party terminated the contract for breach, we assume for purposes of this opinion that the contract was terminated explicitly or implicitly under the cited term of the contract.

3. Keefe does not contest the court's ruling that it cannot recover any payments due more than three years prior to its bringing suit.

4. The statute of limitations issue "may be determinative of the cause pending," D.C.Code § 11–723(a), because summary judgment will be granted in Americable's favor if its argument is correct. Although there is also a question regarding the legality of the contract, the Circuit Court has already concluded that such question was not appropriate for summary judgment. *See Keefe, supra,* 335 U.S.App.D.C. at 119–23, 169 F.3d at 35–39.

## II.

It may be useful to begin with an examination of the operation of the general rule relating to the statute of limitations as applied to installment obligations. This rule was relied upon by the district court in this case and has been established in the jurisprudence of the District of Columbia, as in most of the nation, for at least a century. "[I]t is well settled that where a debt is payable in independent instalments the right of action accrues upon each as it matures, and if the obligee shall fail to commence his action until the statutory bar has intervened in the case of one or more instalments, he can only recover those not barred when his action was commenced." *Washington Loan & Trust Co. v. Darling*, 21 App.D.C. 132, 140 (1903); *see also Le John Mfg. Co. v. Webb*, 91 A.2d 332, 335 (D.C.1952)("It is not open to doubt that under an ordinary installment contract a suit may be brought on each installment as it falls due").[5]

The theory is that each installment due is a separate obligation as to which the statute runs separately. There is nonetheless some recognition of a "single action" principle in the requirement that if and when an obligee elects to file an action, the complaint must include all installments "then due and owing" or the obligee will otherwise be barred as to such overdue obligations not sued upon. *See Le John, supra*, 91 A.2d at 335. However, unlike the normal situation in which a suit is brought on a contract, where a suit is brought to recover installment obligations then due and owing, complete relief need not be sought in that action as to future payments. To the contrary, successive suits may be brought as new installments come due. *See Goodwin v. Cabot Amusement Co.*, 129 Me. 36, 149 A. 574, 578–79 (1930); *Phelps v. Shawprint, Inc.*, 328 Mass. 352, 103 N.E.2d 687, 690 (1952); *Townewest v. Warner Communication*, 826 S.W.2d 638, 640 (Tex.App.1992) ("in regard to future payments that become due and payable, the appellants will again have the right to sue if the appellees continue to dishonor their obligation"); 4 CORBIN ON CONTRACTS § 948 (1951 ed. & Supp. 1999)("If a contract provides for the payment of money in instalments, an action will lie for each instalment as it falls due. A judgment rendered in any one of those actions will not operate as a bar to the maintenance of the others.") and § 950 (but "only one action is maintainable for all instalments of money under a single contract that are overdue when suit is commenced").

Indeed, so embedded is this concept of distinct installment obligations that there is doubt whether an obligee even has the option, absent an acceleration clause, to bring a single suit, seeking both past-due and future payments, based solely on the obligor having missed installments. There is some authority for the proposition that an obligee *may* bring such suit. *See, e.g., Goodwin, supra*, 149 A. at 578–79 (Me.1930)(allowing plaintiff to either sue once for total breach or sue for partial breach as installments came due); *Hoyt v. Horst*, 105 N.H. 380, 201 A.2d 118, 124 (1964) (allowing plaintiff to recover present and future damages for "total breach"); *see also Le John, supra*, 91 A.2d at 335 (citing *Goodwin, supra*, favorably). However, there is also authority to the contrary. *See, e.g., New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936) ("a party to a contract who has no longer any obligation of performance on his side but is in the position of an annuitant or a creditor exacting payment from a

---

5. This court is bound by decisions of the United States Court of Appeals for the District of Columbia Circuit issued prior to February 1, 1971, under the doctrine of *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). For cases applying the installment obligation rule, *see, e.g., William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1191 (D.C.1980)(applying rule to past-due biweekly wages); *Toomey v. Cammack*, 345 A.2d 453, 454 & n. 4 (D.C.1975)(applying rule to past-due monthly payments on promissory note); *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C.1966)(applying rule to four payments due on unspecified debt).

debtor, may be compelled to wait for the instalments as they severally mature"); *Phelps, supra,* 103 N.E.2d at 690; *Federal Recovery of Wash., Inc. v. Wingfield,* 162 Or.App. 150, 986 P.2d 67, 70–71 (1999).

Further, even where the obligor expressly informs the obligee that no further payments will be made, most courts have declined to apply the doctrine of anticipatory repudiation. *See, e.g., Parker v. Moitzfield,* 733 F.Supp. 1023, 1025 (E.D.Va.1990)("Nearly as well established, but not so free of controversy, is the proposition that the doctrine does not apply to unilateral contracts or to contracts the complaining party has fully performed."); *Greguhn v. Mutual of Omaha Ins. Co.,* 23 Utah 2d 214, 461 P.2d 285, 287 (1969)(stating that doctrine does not apply where all that remains is for one party to pay installments of money); *see also Long Island R.R. Co. v. Northville Corp.,* 41 N.Y.2d 455, 393 N.Y.S.2d 925, 362 N.E.2d 558, 563–64 (1977)(summarizing debate about when doctrine should apply); RESTATEMENT (SECOND) OF CONTRACTS, § 243(3)(1981)(indicating that, where all that remains is for the breaching party to make installment payments of money, failure to do so, whether or not accompanied by repudiation, does not constitute "total breach"); 51 AM.JUR.2D, *Limitations of Actions* § 132 (1970)(stating that doctrine does not apply); *but see* CORBIN, *supra,* § 964 (arguing that doctrine should apply).

But even if the nonrepudiating party *may* file suit seeking both past-due and future installments, the question remains whether the party must do so at peril of the bar of the statute of limitations. Otherwise put, must the non-repudiating party "accept" the anticipatory repudiation to render it effective. An early case in this jurisdiction observed, "[a] so-called anticipatory breach only becomes a wrongful act if the promisee elects to treat it as such." *Sheffield v. Paul T. Stone, Inc.,* 68 App. D.C. 378, 380, 98 F.2d 250, 252 (1938). Acceptance is also required by Maryland law because, as the Maryland Court of Appeals explained in *Lane v. Nationwide Mut. Ins. Co.,* 321 Md. 165, 582 A.2d 501, 505–06 (1990)(quoting CORBIN, *supra,* § 989):

> There is no necessity for making the statutory period of limitation begin to run against the plaintiff until the day fixed by the contract for the rendition of performance, at least unless the plaintiff definitely elects to regard the anticipatory repudiation as a final breach. It is generally said that he need not so elect and that he may properly wait until the time that performance was due, before regarding the contract as broken. He is not justified in forbearing to take steps that will mitigate his injury; but the defendant ought not to be allowed to complain at the delay in bringing action against him.... The plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitation is held to begin to run against him immediately.

Acceptance is also required by Texas law. *Townewest, supra,* 826 S.W.2d at 638, involved a cable company which informed a homeowners' association that it was no longer going to make the quarterly payments it had agreed to pay in exchange for the association allowing it to install cable TV. *See Sun Medical, Inc. v. Overton,* 864 S.W.2d 558, 562–63 (Tex.App. 1993) (describing *Townewest* facts). At the time the cable company stopped making payments, the homeowners association had fulfilled its own obligations under the contract, *see id.* at 563, and the cable company had been performing for several years, *see Townewest, supra,* 826 S.W.2d at 640. The court found that the doctrine of anticipatory repudiation did not apply where the association never "accepted or acted upon" the letter, explaining: "The renunciation of the contract merely gives the innocent party to the contract the option to also consider the agreement to be at an end and to then act accordingly."

*Id.; see also Sun Medical, supra,* 864 S.W.2d at 563 (stating that *Townewest* rule only applies where non-repudiating party has fully performed).

Ordinarily, where an obligee wishes to have the option to require present payment of the entire installment debt in the event of a default on an installment payment, a so-called acceleration clause is included in the contract. Conversely, where the obligor wishes to have the right to satisfy the debt in full at any time, a so-called prepayment clause can be included. A consequence of requiring a non-breaching party to bring a present action upon repudiation of future installment payments would be to place the question of acceleration of an installment obligation in the hands of the obligor rather than the obligee. Absent a clause to that effect, the breaching party would have no right to accelerate such payments and should not be able to do so through the mechanism of a breach. Other considerations may be at stake as well where, as here, the amount of the future installment payments is not predetermined but rather dependant on future events.

### III.

It would thus appear, on its face, that the installment obligation rule would readily permit Keefe to bring suit on all unpaid monthly installments that fell due within three years prior to the filing of the complaint. However, Americable argues that the rule does not apply in this case because the contract obligation at issue is simply a "stream of payments." Furthermore, as the certified question indicates, Americable argues that the situation here is different because it has repudiated or breached the contract "as a whole" and thus triggered a single limitations period. We examine those arguments in light of the principles set forth in the previous section.

### A.

Initially, Americable suggests that its contract with Keefe contemplated a "stream of payments," not an installment obligation at all. However, this distinction is merely grammatical. Whether an installment obligation exists does not depend on whether it is labeled as such but rather on the nature of the obligation, and we cannot fault the district court for concluding that this contract creates an installment obligation. See, e.g., *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* 522 U.S. 192, 209–10, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997)(rejecting argument that installment obligation rule depends on origin of the obligation and holding that federal statute created installment obligation); *Peterson v. Highland Music Inc.,* 140 F.3d 1313 (9th Cir.)(applying installment obligation rule to contract which created "no fixed amount to be paid out over time ... but rather a continuing obligation to pay a portion of the profits and royalties on [the song the plaintiffs sold thirty years prior] as the recording gets used over time"), *cert. denied,* 525 U.S. 983, 119 S.Ct. 446, 142 L.Ed.2d 401 (1998); *C–B Realty & Trading Corp. v. Chicago & N.W. Ry.,* 289 Ill.App.3d 892, 225 Ill.Dec. 59, 682 N.E.2d 1136, 1141 (1997)(applying installment obligation rule to tax payments required by contract which were "due at regular intervals, just like installment payments"); *Townewest, supra,* 826 S.W.2d at 640 (applying installment obligation rule to quarterly payments owed to homeowners associations by cable company for past services rendered).

This interpretation of the Keefe–Americable contract does not allow a single cause of action to "re-appear, phoenix-like, every month," as Americable characterizes it, but rather recognizes that new, independent causes of action accrue each month as a direct result of the installment obligation Americable negotiated with Keefe. Indeed, Americable's obligation here seems to us quite comparable to that

in *Darling, supra,* 21 App.D.C. at 132, which involved a contract to pay the plaintiff $50 a month for her lifetime as compensation for past services rendered. The *Darling* court concluded that it was "undoubtedly correct" that the statute of limitations would only bar the plaintiff's attempts to recover payments due more than three years prior to her bringing suit. *See id.* at 140.

We turn then to Americable's argument that its asserted repudiation or breach of the contract as a whole negated the application of the installment obligation rule. In essence, it argues that such action triggered a single limitations period when the contract was terminated; that is, Keefe was required at its peril to bring an action, even on the future installment obligations, within three years of that time.

### B.

■ We must observe preliminarily that there is considerable doubt whether, on the record before us, an adequate showing has been made by Americable of a sufficient repudiation or breach of the contract as a whole. "For a repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C. 1976), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977); *see also Reiman v. International Hospitality Group,* 614 A.2d 925, 928 (D.C.1992); *Minidoka Irrigation Dist. v. DOI,* 154 F.3d 924, 926 (9th Cir.1998)("The Supreme Court has stated that to repudiate a contract, a party must make 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.'") (citation omitted); *Rosenbloom v. Feiler,* 290 Md. 598, 431 A.2d 102, 111 (1981)("in order to constitute anticipatory repudiation, there

must be a definite, specific, positive, and unconditional repudiation of the contract").

We see nothing in the record that could meet this requirement. Where a contract involves future installment obligations, it seems logically to follow that repudiation of the contract in its entirety would require a clear anticipatory breach of all future obligations in addition to any present breach. We would hesitate to infer anticipatory breach from present breach in any case. *See Trustees for Alaska Laborers–Constr. Indus. Health & Sec. Fund v. Ferrell,* 812 F.2d 512, 518 (9th Cir. 1987)("It is well-settled in jurisdictions which recognize repudiation by conduct, that mere noncompliance with contractual obligations does not constitute an effective repudiation."). In the instant case, there is especial reason not to make such an inference: the express provisions of Paragraph 4(B) and related sections quoted above.

■ Similarly, we do not readily find any clear indication of "breach of the contract as a whole." Americable had a number of obligations under its contract with Keefe, some of which it fulfilled, some of which it allegedly breached, and some of which are likely not yet due. "A total breach may be by repudiation or by such a material failure of performance when due as to 'go to the essence' and frustrate substantially the purpose for which the contract was agreed to by the injured party." *San Carlos Irrigation & Drainage Dist. v. United States,* 23 Cl.Ct. 276, 280 (1991) (citation omitted). Absent a clear understanding of the relative weights of a party's obligations and other factors, it may be uncertain whether any given breach was a nonperformance of duty "so material and important as to justify the injured party in regarding the whole transaction as at an end," CORBIN, *supra,* § 946, especially where the other party has no obligations left to perform and the breaching party has extensive future installment obligations. From the facts as presented to us, it appears that the obligation to pay

installments based on future revenues was potentially a far greater source of income than the one-time payment provision. *See Hi–Lite Products Co. v. American Home Products Corp.,* 11 F.3d 1402, 1409 (7th Cir.1993)(remanding to district court to determine whether a single total breach occurred on the facts).

However, notwithstanding these reservations, we shall take the certified question as it comes to us, assume that Americable has sufficiently repudiated and breached the contract as a whole to the extent that such actions are possible in the circumstances here, and proceed to Americable's further arguments.

### C.

To begin with, we think it patent that the termination of the contract itself pursuant to the terms thereof, see *supra* note 2, cannot in itself affect the outcome. Here, the contract expressly provided that its termination would not affect Keefe's right to continued payments. Furthermore, such payments were in consideration of services that had already been fully performed, and there was no future performance by Keefe upon which the payments were contingent.

Thus, this case is quite different from, say, those in which the damages flowed from the alleged wrongful termination or suspension of employment itself. For example, *Press v. Howard Univ.,* 540 A.2d 733 (D.C.1988), and *Keller v. Marvins Credit, Inc.,* 147 A.2d 872 (D.C.1959), both involved employees who alleged that they had been wrongfully suspended or terminated and thereby deprived of future wages never earned. In both cases we concluded that the action accrued and the statute of limitations began running when the employee was suspended or terminated. However, the "general rule ... that

an employee who is discharged in violation of his contract of employment may sue only once and at that time recover all present and prospective damages," *Keller, supra,* 147 A.2d at 873, is premised on there being a single event, discrete in time, from which all damages flow. *See, e.g., Press, supra,* 540 A.2d at 735 ("the alleged breach of the contract—the suspension—occurred only once"); *Keller, supra,* 147 A.2d at 874 (refusing to apply installment obligation rule to action based on wrongful discharge because "after appellant's discharge no installment of wages became due").[6] *Cf. Young, supra,* 412 A.2d at 1191 (concluding that separate causes of action accrued biweekly on wages owed for services already rendered); *Ritter v. Theodore Pendergrass Teddy Bear Prod., Inc.,* 356 Pa.Super. 422, 514 A.2d 930, 934–35 (1986)(concluding that separate statutes of limitations would run from each date on which a periodic payment came due under personal management contract, not from date on which said contract terminated, because terms of contract obligated defendant to make periodic payments to plaintiff as compensation for past services rendered even well beyond the term of the contract).

A similar one-action rule applies in malpractice actions: the plaintiff must bring a single suit for all present and future damages flowing from a discrete act of negligence as soon as he or she becomes aware of some injury on which to base the suit. *See Moattar v. Foxhall Surgical Assoc.,* 694 A.2d 435, 440 (D.C.1997); *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472–73 (D.C.1994). The same rule may even apply in actions based on contract interpretation. *See Air Transport v. Lenkin,* 711 F.Supp. 25, 27 (D.D.C.1989)(holding that tenant's action, alleging that landlord had misinterpreted contract as to amount of rent due, accrued seventeen years prior

---

**6.** An interesting twist in *Keller, supra,* is that the employer actually continued paying wages for some time after terminating the plaintiff, but ceased doing so before the term of employment would have expired had the contract run its course. We explicitly declined to consider whether the statute started running on the date of termination or the date of payment cessation. *Keller, supra,* 147 A.2d at 874.

when landlord first clearly interpreted the contract, and distinguishing installment cases as involving "single, limited breach[es]" as opposed to one interpretation "which would govern throughout the life of the contract"), *aff'd on other grounds*, 283 U.S.App.D.C. 280, 899 F.2d 1265 (1990); *see also Dinerstein v. Paul Revere Life Ins. Co.*, 173 F.3d 826, 828 (11th Cir.1999)(applying similar rationale to interpretation of insurance contract).

It cannot be, though, that termination or repudiation of an installment contract which the obligee has already fully performed on his part can have the same effect. As already indicated, the rule in such cases is clear that nonpayment of one installment triggers no requirement to sue on the totality of the debt and that the very principle of anticipatory repudiation is in doubt, much less any obligation on the obligee to bring suit in such a situation. Nor does the concept of a breach of the installment obligation as a whole have any place in the application of the installment obligation rule.

**D.**

If the installment obligation rule is not to apply here, the only basis for ruling that a single statute of limitations applies would have to be that the contract in question did not consist solely of installment obligations payable monthly but also contained a distinct and significant "one-time" payment clause that was breached in its entirety. Since the statute of limitations clearly began to run on that entire payment when it fell due, the argument might go, the entirety of the installment payment obligations likewise was subject to a single statute of limitations.

We think such a concept, generally applied, would cut against the very foundation of the installment obligation rule as discussed above. It would permit, in ef-

fect, unilateral acceleration of that debt by the defaulting obligor and negate the principle of separate obligations and separate statutes of limitations. If Americable could not trigger the statute of limitations by repudiating or breaching the installment obligation itself, we are unable to see why the presence of an additional and distinct obligation to presently pay other monies under the contract should change the situation in the circumstances here.[7]

A case cited by both parties, *Habib v. Raytheon Co.*, 199 U.S.App.D.C. 11, 616 F.2d 1204 (1980), has some relevance. *Habib* involved a severable contract, the first part of which essentially provided for a $25,000 annual salary to be paid to the plaintiff Habib in exchange for his serving as a consultant to the Raytheon subsidiary Rayserve, and the second part of which gave Habib a commission on the sale of any weapons system to Saudi Arabia as compensation for his assistance in identifying a Saudi Arabian agent for Rayserve to work with, specifically a member of the royal family named Prince Abdallah. Rayserve purported to terminate the contract and stopped paying Habib his salary in early 1972. In April 1973, Rayserve made its first sale of a weapons system to Saudi Arabia.

In February 1978, Habib brought suit for breach of contract and other claims. Treating the first part of the contract like a typical employment agreement, the appellate court ruled that any claims relating to the consultancy arrangement accrued in January 1971 when Rayserve breached that agreement. *Id.* at 16, 616 F.2d at 1209. As to the second part of the contract, however, the court concluded that Rayserve had a continuing obligation under the terms of the contract to pay Habib for as long as Rayserve made payments to Prince Abdallah, so that the limitations period on the particular commission at is-

---

7. This is not to say that a factual situation could not exist where the installment obligation and other breached provisions of the contract were so intertwined and interdependent that the installment obligation was necessarily affected by the breached provisions. That plainly is not the case here.

sue did not begin running until the earliest date on which Habib could have collected it, which was mid–1975 under the terms of the contract. *Id.* at 16–17, 616 F.2d at 1209–10.

The *Habib* court specifically noted that "Rayserve [could not] unilaterally terminate its obligation to pay Habib a commission once he had performed." *Id.* at 17 n. 6, 616 F.2d at 1210 n. 6; *cf. Bauers v. City of Lincoln,* 245 Neb. 632, 514 N.W.2d 625, 631 (1994)("[O]nce a pension has been granted, the recipient is entitled to each installment, and the obligor has a continuing obligation to pay each installment that comes due. As to each installment, if a cause of action arises, the statute of limitations shall begin to run from the date of such installment"). An analogous principle applies here. Americable, by breach of one provision calling for a present payment of money, could not unilaterally affect its distinct obligation to pay Keefe in installments out of future revenues for past services rendered. To allow Americable to invoke the statute of limitations by such a breach or repudiation of the whole would permit it to unilaterally accelerate the distinct installment action and deprive Keefe of the right to have the payments determined on the basis of actual revenues as they may exist from time to time. We see nothing to justify such a departure from the normal operation of the installment obligation rule.

It is true that the *Habib* contract provided for a distinct service to be rendered in exchange for the commission as opposed to that rendered for the annual salary, and met a classic definition of severability, a fact noted and relied on by the court. *See Habib, supra,* 199 U.S.App.D.C. at 15–16, 616 F.2d at 1208–09. However, we think the forms of compensation to Keefe in the case before us are sufficiently distinct to warrant similar treatment, at least for application of the installment obligation rule.

For the foregoing reasons, we answer the certified question by holding that, on the facts as presented to us, the statute of limitations does not bar Keefe's action to recover installment payments that accrued within three years prior to the filing of the action. Pursuant to D.C.Code § 11–723(g), the Clerk is hereby directed to transmit a copy of this opinion to the United States Court of Appeals for the District of Columbia and to the parties.

*So ordered.*